**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

FILED IN OPEN COURT
MAR 2 4 2023
CHARLES R. DIARD, JR.
CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO. 22-00237-TFM-1** |
| | ) | |
| JAIRICE LYNN SHELTON | ) | |

## PLEA AGREEMENT

The defendant, **JAIRICE LYNN SHELTON**, represented by his counsel, and the United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

## RIGHTS OF THE DEFENDANT

1.      The defendant understands his rights as follows:

    a.      To be represented by an attorney;

    b.      To plead not guilty;

    c.      To have a trial by an impartial jury;

    d.      To confront and cross-examine witnesses and to call witnesses and produce other evidence in his defense; and

    e.      To not be compelled to incriminate himself.

## WAIVER OF RIGHTS AND PLEA OF GUILTY

2.      The defendant waives rights b through e, listed above, and pleads guilty to the following Counts of the Indictment:

    a.      Count One, charging a violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Bank Fraud;

1

b.      Count Nine, charging a violation of Title 18, United States Code, Section 1028A(a)(1), Aggravated Identity Theft;

c.      Count Eleven, charging a violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Bank Fraud; and

d.      Count Fourteen, charging a violation of Title 18, United States Code, Section 1028A(a)(1), Aggravated Identity Theft.

3.      The defendant understands that the statements he makes under oath in the plea of guilty must be completely truthful and that he can be prosecuted for making false statements or perjury, or receive a perjury enhancement at sentencing, for any false statements he makes intentionally in this plea of guilty.

4.      The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.

5.      The defendant is not under the influence of alcohol, drugs, or narcotics. He is certain that he is in full possession of his senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing that will follow.

6.      The defendant has had the benefit of legal counsel in negotiating this Plea Agreement. He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charges that have been brought against him. The defendant's attorney has also explained to the defendant his understanding of the United States' evidence and the law as it relates to the facts of his offenses.

7.      The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charges beyond a reasonable doubt. The

defendant and his counsel have discussed possible defenses to the charges. The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

8.      The defendant recognizes that pleading guilty may have consequences with respect to immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offenses to which he is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. The defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

9.      A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. The defendant and the United States agree that the Factual Resume is true and correct. Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and his counsel are not part of this agreement and are not agreed to by the United States.

10.     This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement. There have been no promises from anyone as to the particular sentence that the Court will impose. The defendant is pleading guilty because he is guilty.

11.     The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter. This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## PENALTY

12.     The maximum penalty the Court could impose as to Counts One and Eleven of the Indictment is:

a.      Thirty (30) years' imprisonment;

b.      A fine not to exceed $1,000,000;

c.      A term of supervised release of five (5) years, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

d.      A mandatory special assessment of $100.00; and

e.      Such restitution as may be ordered by the Court.

13.     The maximum penalty the Court could impose as to Counts Nine and Fourteen of the Indictment is:

a.      A mandatory term of two (2) years' imprisonment, which must run consecutively to any other term of imprisonment imposed on the defendant;

b.      A fine not to exceed $250,000;

c.      A term of supervised release of one (1) year, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

4

  d.  A mandatory special assessment of $100.00; and

  e.  Such restitution as may be ordered by the Court.

## SENTENCING

14.  The Court will impose the sentence in this case. The United States Sentencing Guidelines are advisory and do not bind the Court. The defendant has reviewed the application of the Guidelines with his attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation. The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines. The defendant understands that he will not be allowed to withdraw his guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

15.  The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

16.  The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation. Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

17.  Both the defendant and the United States are free to allocute fully at the time of sentencing.

18.  The defendant agrees to tender $400.00 to the U.S. District Court Clerk in satisfaction of the mandatory special assessment in this case. The United States reserves the right to withdraw any favorable recommendations it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of his sentencing.

## RESTITUTION

19.  Pursuant to 18 U.S.C. §§ 3556 and 3663A, restitution is mandatory. The defendant agrees to make full restitution in an amount to be determined by the Court at sentencing and as to all relevant conduct regardless of whether it relates to the counts of conviction.

## FORFEITURE

20.  The defendant agrees to confess the forfeiture to the United States of all properties that represent proceeds of his criminal activities or that facilitated any aspect of these illegal activities. The property to be forfeited includes, but is not limited to, $12,993 in U.S. currency.

## FINANCIAL OBLIGATIONS

21.  The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant

exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

## UNITED STATES' OBLIGATIONS

22.    The United States will not bring any additional charges against the defendant related to the facts underlying the Indictment and will move to dismiss any remaining charges against the defendant once sentence is imposed in this case. This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not bind any other federal, state, or local prosecuting authorities.

23.    The United States will recommend to the Court that the defendant be sentenced at the low end of the advisory sentencing guideline range as determined by the Court.

## APPLICATION OF USSG § 5K1.1 AND/OR FED. R. CRIM. P. 35

24.    The defendant understands and agrees that he has no right to cooperate, and that the decision whether to allow him to cooperate is reserved solely to the United States in the exercise of its discretion. If the United States agrees to allow the defendant to cooperate, and if the defendant agrees to cooperate, the following terms and conditions apply:

a.    The defendant shall fully, completely, and truthfully respond to all questions put to him by law enforcement authorities regarding the underlying facts of the offenses with which he is charged, as well as the underlying facts of any criminal offense(s), state or federal, of which he has information or knowledge.

b.  The defendant acknowledges that he understands that he shall provide truthful and complete information regarding any offense about which he has knowledge or information regardless of whether law enforcement authorities question him specifically about any such offense. This provision requires the defendant to divulge all information available to him even when law enforcement authorities do not know about the defendant's involvement, knowledge or information relating to any particular offense. This requirement extends to any and all persons about whom the defendant has such knowledge or information.

c.  The defendant agrees to cooperate completely with all law enforcement authorities in any matters to which his cooperation may be deemed relevant by any law enforcement authority. The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance he shall provide. This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying completely and truthfully before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d.  If the United States deems it necessary, the defendant may be required to take a polygraph examination(s) which will be administered by a government polygrapher. The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether there has been substantial assistance, and are admissible at

8

sentencing to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States.

e.    The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in his possession or under his control and which are relevant to his participation in and knowledge of criminal activities, regardless of whether it relates to the charged offense. This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

f.    The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

g.    If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable. The United States specifically reserves the right to make the decision relating to the extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation. The

9

defendant understands that the United States will make no representation or promise with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance. The defendant understands that a mere interview with law enforcement authorities does not constitute substantial assistance. The defendant also understands that, should he provide untruthful information to the United States at any time, or fail to disclose material facts to the United States at any time, or commits a new criminal offense, the United States will not make a motion for downward departure. If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend that the defendant receive a sentence at the low end of the advisory guideline range.

h.    The United States and the defendant agree that any breach of this agreement by the defendant, including but not limited to committing a new offense, failing to cooperate, intentionally withholding information, giving false information, committing perjury, failing to identify assets obtained by him from his illegal activities or obtained by others associated with him or of which he has knowledge, refusing to take a polygraph examination, failing a polygraph examination, or refusing to testify before the grand jury or at any judicial proceeding, would:

10

(1)    permit the United States to reinstate and proceed with prosecution on any other charges arising from the matters underlying the Indictment; and

(2)    permit the United States to initiate and proceed with the prosecution on any other charges arising from a breach of this agreement. The United States will not be limited, in any respect, in the use it may make against the defendant of any information provided by the defendant during his breached cooperation. Such breach will constitute a waiver of any claim the defendant could make under the United States Constitution, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, or any statute or case law by which the defendant seeks to suppress the use of such information or any evidence derived from such information.

i.    Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement, including perjury, false declaration, false statement, and obstruction of justice, should the defendant commit any of these offenses during his cooperation. The defendant acknowledges and agrees that the information that he discloses to the United States pursuant to this agreement may be used against him in any such prosecution.

j.    The United States and the defendant agree that the defendant will continue his cooperation even after he is sentenced in the instant matter. His failure

to continue his cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate the charges and the prosecution of the charges in the Indictment, which are to be dismissed in accordance with this agreement. Under these circumstances, the defendant expressly waives any rights he may have under the statute of limitations and the speedy trial provisions.

## LIMITED WAIVER OF RIGHT TO APPEAL AND WAIVER OF COLLATERAL ATTACK

25.    As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Accordingly, the defendant will not challenge his guilty plea, conviction, or sentence in any district court or appellate court proceedings.

a.    **EXCEPTIONS.** The defendant reserves the right to timely file a direct appeal challenging:

(1)    any sentence imposed in excess of the statutory maximum;

(2)    any sentence which constitutes an upward departure or variance from the advisory guideline range.

The defendant also reserves the right to claim ineffective assistance of counsel in a direct appeal or § 2255 motion.

26.     If the United States files a notice of appeal and such appeal is authorized by the Solicitor General, the defendant is released from the appellate waiver.

27.     The defendant further reserves the right to timely move the district court for an amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the sentence.

28.     If the defendant receives a sentence within or below the advisory guideline range, this plea agreement shall serve as the defendant's express directive to defense counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

## **VIOLATION OF AGREEMENT**

29.     The defendant understands that if he breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the defendant. In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge. In such event, the defendant agrees not to assert any objections to prosecution that he might have under the Sixth Amendment and/or Speedy Trial Act.

30.     In addition, if the defendant is released from detention prior to sentencing, he understands that the United States will no longer be bound by this agreement if he violates any condition of his release prior to sentencing or prior to serving his sentence after it is imposed.

## **ENTIRETY OF AGREEMENT**

31.    This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,

SEAN P. COSTELLO
UNITED STATES ATTORNEY

Date: March 6, 2023

Justin D. Roller
Assistant United States Attorney

Date: 3-7-23

Kasee S. Heisterhagen
Assistant United States Attorney
Deputy Chief, Criminal Division

14

I have consulted with my counsel and fully understand all my rights with respect to the offenses charged in the Indictment pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true and accurate in every respect, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

Date: 3/24/23

_____
Jairice Lynn Shelton
Defendant

I am the attorney for the defendant. I have fully explained his rights to him with respect to the offenses charged in the Indictment in this matter. I have carefully reviewed every part of this Plea Agreement with him. To my knowledge, his decision to enter into this agreement is an informed and voluntary one. I have carefully reviewed the Factual Resume, incorporated herein, with the defendant and to my knowledge, his decision to stipulate to the facts is an informed, intelligent and voluntary one.

Date: 3/24/23

_____
H. Chase Dearman
Attorney for Defendant

15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 22-00237-TFM-1 |
| | ) | |
| JAIRICE LYNN SHELTON | ) | |

## FACTUAL RESUME

The defendant, **JAIRICE LYNN SHELTON**, admits the allegations of Counts One, Nine, Eleven, and Fourteen of the Indictment.

## ELEMENTS OF THE OFFENSE

**SHELTON** understands that in order to prove a violation of Title 18, United States Code, Section 1349, as charged in Counts One and Eleven of the Indictment, the United States must prove:

First:     two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit bank fraud, as charged in the Indictment; and

Second:     the defendant knew the unlawful purpose of the plan and willfully joined in it.

**SHELTON** further understands that in order to prove a violation of Title 18, United States Code, Section 1028A(a)(1), as charged in Count Nine and Fourteen of the Indictment, the United States must prove:

First:     the defendant knowingly transferred, possessed, or used another person's means of identification;

Second:     without lawful authority; and

Third:     during and in relation to the eligible felony alleged in the Indictment.

1

## OFFENSE CONDUCT

**SHELTON** admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case. This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for **SHELTON's** plea of guilty. The statement of facts does not contain each and every fact known to **SHELTON** and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement. All dates, times, amounts, and locations referenced below are approximations.

## Counts One and Nine

**SHELTON** admits that from at least February 2021 through and including October 2022, in the Southern District of Alabama, Southern Division, and elsewhere, he willfully, knowingly, and unlawfully combined, conspired, confederated, and agreed together with other persons to commit an offense against the United States, namely, bank fraud in violation of 18 U.S.C. § 1344(1). Specifically, **SHELTON**, his codefendants named in Count One of the Indictment, and other coconspirators known and unknown, with intent to defraud, knowingly conspired to execute, and attempt to execute, a scheme and artifice to defraud the banks and credit unions named in the Indictment, financial institutions the deposits of which were, at the time of the offense, federally insured by the Federal Deposit Insurance Corporation ("FDIC") and the National Credit Union Administration.

The purpose and object of the conspiracy was for **SHELTON** and his coconspirators to unjustly enrich themselves by defrauding the banks and credit unions named in the Indictment of money and property. To accomplish the conspiracy, **SHELTON** and his coconspirators committed, among other things, the following acts: (a) obtaining, possessing, and opening stolen U.S. mail to acquire checks without authorization from their lawful owners; (b) producing

counterfeited and forged checks using information derived from checks stolen from the U.S. mail;
(c) obtaining, possessing, and using stolen identification documents, including driver's licenses;
(d) producing false identification documents, including driver's licenses; (e) obtaining,
possessing, and using means of identification of other persons, including names, addresses, bank
account numbers, and signatures; (f) making unlawful mobile and automated teller machine
("ATM") deposits of counterfeited and forged checks; and (g) making unlawful cash withdrawals
and transfers using the proceeds of deposits of counterfeited and forged checks.

The above-described fraud scheme came to the attention of federal law enforcement in
December 2021, when a security specialist from Iberia Bank ("Iberia") contacted federal agents to
report a mail theft and counterfeit check-cashing scheme. Specifically, in early December 2021,
an Iberia customer placed six checks in its outgoing business mailbox, which was located on
Grelot Road in Mobile, Alabama. Those six checks, which had been made out to various clients
of the victim business identified herein and in the Indictment as "D.S.T., Inc.," were drawn on the
business's Iberia account and each bore the signature of a real person and authorized representative
of the business. The checks were then stolen from D.S.T., Inc.'s mailbox, altered, and negotiated
by individuals who were not authorized to possess or negotiate the checks. The checks were also
later used as a template for various additional counterfeit checks that were fraudulently deposited
as part of the above-described fraud scheme.

Iberia provided federal agents with copies of the original, legitimate business checks, as
well as copies of the stolen and forged checks for comparison. Iberia's report led federal agents to
obtain records and accountholder information for the accounts into which the counterfeited checks
had been deposited. Table 1 below provides details regarding the counterfeited checks of D.S.T.,
Inc. that were deposited, including (a) dates of deposits; (b) check numbers; (c) amounts;

3

(d) names of the accountholders listed as payees on the counterfeited checks; and (e) the financial institutions into which the counterfeited checks were deposited:

| Date of Deposit | Check Number | Amount | Accountholder (Payee) | Accountholder's Financial Institution |
|---|---|---|---|---|
| 12/06/2021 | 199633 | $13,210.10 | B.J. | Navy Federal Credit Union ("NFCU") |
| 12/07/2021 | 199623 | $6,605.08 | K.H. | NFCU |
| 12/07/2021 | 199630 | $2,201.69 | K.H. | NFCU |
| 12/07/2021 | 199625 | $3,302.55 | J.P. | Regions Bank ("Regions") |
| 12/08/2021 | 199624 | $3,302.55 | J.B. | Regions |
| 12/08/2021 | 199631 | $2,201.69 | J.P. | Regions |
| 12/27/2021 | 199763 | $6,605.08 | T.M. | Wells Fargo Bank, N.A ("Wells Fargo") |
| 12/30/2021 | 199622 | $6,605.08 | C.K. | Regions |
| 12/31/2021 | 199627 | $2,201.69 | J.P. | Regions |
| 12/31/2021 | 199632 | $2,201.69 | J.P. | Regions |
| 01/07/2022 | 199765 | $1,921.09 | D.J. | NFCU |
| 01/07/2022 | 199766 | $1,946.00 | D.W. | NFCU |
| 01/07/2022 | 199767 | $1,805.09 | R.M. | NFCU |
| 01/18/2022 | 1102346 | $5,282.20 | T.N. | Regions |
| **TOTAL:** | | **$59,391.58** | | |

*Table 1* **(Iberia counterfeited check deposit information).**

Based on the above-referenced information, agents interviewed various coconspirators who participated in the scheme alleged in Count One of the Indictment. Agents also obtained records revealing fraudulent deposits of additional counterfeited checks corresponding to other victim businesses, including fraudulent deposits and withdrawals by **SHELTON**. Agents also obtained search warrants for **SHELTON's** Instagram account content, which contained numerous messages, photographs, and videos regarding his fraudulent activities and willful participation in the scheme alleged in Count One. **SHELTON's** communications with coconspirator Arrington Jaylun Gardner ("Gardner") in furtherance of the scheme were located on extractions of Gardner's

4

cell phones. ~~Law enforcement's investigation revealed **SHELTON** to be one of the leaders of the scheme.~~

    **SHELTON** and his coconspirators used checks stolen from the U.S. mail to produce counterfeited versions for the illegal deposits. **SHELTON** and his coconspirators also used social media, including Facebook and Instagram, to recruit accountholders to provide **SHELTON** with their bank account information and debit and credit cards to make fraudulent deposits of counterfeited checks and subsequent withdrawals of illicit proceeds of the scheme. **SHELTON** obtained illicit proceeds in various ways, including ATM withdrawals of cash and transfers via Cash App, a mobile payments application. During the period of the conspiracy charged in the Indictment, **SHELTON** was captured numerous times on bank surveillance video making fraudulent deposits and withdrawals at ATMs within the Southern District of Alabama and elsewhere.

    For example, at 6:56 pm on December 30, 2021, Regions surveillance video captured **SHELTON** and Gardner depositing the counterfeited and forged check depicted as check number 199622 in Table 1 above, which was made payable to C.K. in the amount of $6,605.08. The check bore the name and signature of an authorized representative of D.S.T., Inc., identified herein and in the Indictment as "J.G." J.G. confirmed to law enforcement that neither **SHELTON** nor Gardner had any lawful authority to possess the counterfeited check containing her name and signature. The fraudulent deposit occurred at the Regions branch located at 891 Hillcrest Road, Mobile, Alabama 36695. Gardner was in a vehicle and **SHELTON** approached the ATM on foot. The video depicts **SHELTON** endorsing and inserting the fraudulent check into the ATM. **SHELTON's** cell phone location records from Verizon place him in the immediate vicinity of the Regions on Hillcrest Road at the time of the fraudulent deposit. Moreover, **SHELTON** and

Gardner exchanged several Instagram messages regarding conducting fraudulent transactions at Regions during the same timeframe as the fraudulent deposit. As charged in Count Nine of the Indictment, **SHELTON** admits that he transferred, possessed, and used J.G.'s means of identification—*i.e.*, J.G.'s name and signature—without lawful authority and during and in relation to the bank-fraud conspiracy charged in Count One of the Indictment, to which he is pleading guilty.

Similarly, at 6:16 pm on December 31, 2021, Regions ATM surveillance video captured **SHELTON** and Gardner depositing additional forged and counterfeited checks at the Hillcrest location. One of the fraudulent checks (number 1926) that **SHELTON** and Gardner deposited was purportedly made payable to P.B. in the amount of $2,916.25, and was drawn on a Fidelity Bank account (number x1887) of a victim business in Mandeville, Louisiana, identified herein and in the Indictment as "W.E.P.C." The check bore the name and signature of the victim owner of W.E.P.C., identified herein and in the Indictment as "H.W." H.W. confirmed to law enforcement that the original check from which the counterfeited version was produced had been stolen from the mail and that neither **SHELTON** nor Gardner was authorized to possess or deposit it.

Another fraudulent check (number 10632) that **SHELTON** and Gardner deposited was purportedly made payable to K.N. in the amount of $897.25, and was drawn on a First Bank & Trust account (number x9300) of a victim business in Metairie, Louisiana, identified herein and in the Indictment as "G.C., LLC." As noted above, **SHELTON's** cell phone location data places him in the vicinity of the Hillcrest Road Regions location at the time of the fraudulent deposits. ATM surveillance video shows **SHELTON** using his cell phone during the fraudulent transactions. Additionally, **SHELTON's** Instagram account content and phone-toll records show that he and Gardner were in frequent and contemporaneous communication with each other during the

6

transactions. **SHELTON** received Cash App payments for the fraudulent deposits to a Cash App account that he opened using the identity of another person, which he identified in his Instagram messages as a Cash App account that he controlled.

Regions ATM surveillance video from December 31, 2021 and January 1, 2022, captured **SHELTON** making withdrawals of the illicit proceeds from P.B.'s and K.N.'s accounts at a branch located on Airport Boulevard in Mobile. Again, **SHELTON's** phone-location records place him in the vicinity of the bank at the times of these ATM withdrawals. Additionally, photos and videos that **SHELTON** took of himself on Instagram depict him wearing the same clothing he was wearing on video during the withdrawals.

Later, at 7:10 pm on March 10, 2022, Regions ATM video captured **SHELTON** depositing another forged and counterfeited check, this time at the Crichton branch located at 2720 Spring Hill Avenue in Mobile. The fraudulent check (number 20404) that **SHELTON** deposited was purportedly made payable to D.G. in the amount of $9,735.00, and was drawn on a Shinhan Bank account (number x4366) of a victim business in Duluth, Georgia. Once again, **SHELTON's** phone-location records place him in the vicinity of the Crichton Regions at the time of the fraudulent deposit. **SHELTON** also exchanged several Instagram messages with Gardner contemporaneously discussing the fraudulent deposit. Similarly, **SHELTON** took a video of himself on Instagram depicting a withdrawal receipt for an $800 ATM cash withdrawal from D.G.'s account that he made at another Regions branch on University Boulevard in Mobile on March 10, 2022.

The above-referenced fraudulent transactions are a non-exhaustive sample of **SHELTON's** fraudulent activities in furtherance of the scheme alleged in Count One to which he is pleading guilty. **SHELTON's** Instagram account contains hundreds of pictures and videos

documenting his participation in the scheme, including point-of-view videos of himself making deposits and withdrawals at various ATMs, photos and videos of other peoples' debit cards, and photos and videos of himself holding large stacks of cash wearing the same clothing he wore during fraudulent deposits captured on ATM surveillance video.

On January 4, 2023, federal agents executed a search warrant at **SHELTON's** house in Kennesaw, Georgia, after arresting him on a federal warrant issued in the above-captioned case. During the search of the house, agents recovered, among other things, several electronic devices, stolen driver's licenses, a stolen social security card, and stolen debit cards belonging to identity-theft victims. **SHELTON** used one of the victims' identities to open a Cash App account into which he received cash deposits. Agents also recovered and searched **SHELTON's** laptop, which contained evidence of his fraudulent activity, including but not limited to check-printing software and personal identifying information of identity-theft victims. Agents also recovered $12,993.00 in U.S. currency, which **SHELTON** admits is forfeitable as proceeds of his fraudulent activities.

**Counts Eleven and Fourteen**

**SHELTON** admits that from at least April 2022 through and including May 2022, in the Southern District of Alabama, Southern Division, and elsewhere, he and his codefendant, Gardner, willfully, knowingly, and unlawfully combined, conspired, confederated, and agreed together and with other persons to commit an offense against the United States, namely, bank fraud in violation of 18 U.S.C. § 1344(1). Specifically, **SHELTON**, his codefendant named in Count Eleven of the Indictment, and other coconspirators known and unknown, with intent to defraud, knowingly conspired to execute, and attempt to execute, a scheme and artifice to defraud Bank of America, N.A. ("BoA") and Capital One, N.A. ("Capital One"), financial institutions the deposits of which were, at the time of the offense, federally insured by the FDIC.

8

The purpose and object of the conspiracy was for **SHELTON** and his coconspirators to unjustly enrich themselves by defrauding BoA and Capital One of money and property. To accomplish the conspiracy, **SHELTON** and his coconspirators committed, among other things, the following acts: (a) obtaining, possessing, and using means of identification of other persons, including names, dates of birth, social security numbers, and addresses; (b) producing false identification documents, including driver's licenses, using means of identification of other persons; and (c) using means of identification of other persons and false identification documents to obtain automobile loans from BoA and Capital One in connection with the purchase of automobiles from Mobile Mitsubishi ("Mitsubishi"), an automobile dealership located at 3024 Airport Boulevard, Mobile, Alabama 36606. BoA and Capital One provide automobile loans to customers of Mitsubishi.

On July 12, 2022, federal agents executed a search warrant at Gardner's apartment in Mobile and recovered several items of evidence. Among the items seized from Gardner's apartment was a fake New Jersey driver's license bearing Gardner's picture and the name of an identity-theft victim identified herein and in the Indictment as "D.G.," who is a resident of Philadelphia, Pennsylvania. Agents also seized key fobs bearing BMW and Audi logos. In the parking lot outside Gardner's apartment, agents located a white 2017 BMW X1, Vehicle Identification Number ("VIN") WBXHU7C33H5H37378 (the "BMW"). The BMW had a license plate frame displaying the logo and website of Mitsubishi. Agents seized and towed the BMW pursuant to a federal seizure warrant.

Agents' subsequent investigation revealed that **SHELTON** and Gardner misappropriated and used D.G.'s identity to finance and purchase the BMW and a 2020 Audi A5 Sportback, VIN WAUANCF51LA005858, from Mitsubishi on May 2, 2022, and May 3, 2022. Agents found the

9

Audi at the Mobile Police Department's impound lot, where it had been towed after being wrecked and abandoned on the shoulder of Interstate 65 in Mobile. The Audi likewise bore a tag and license plate frame from Mitsubishi.

Mitsubishi provided agents with the contract paperwork that **SHELTON** and Gardner fraudulently submitted and signed in connection with the financing and purchases of the vehicles. As for the Audi, on May 2, 2022, **SHELTON** and Gardner misrepresented that Gardner was D.G. to buy the car for the total amount of $49,742.21, putting $5,000 down in cash and financing the remainder through BoA (automobile loan number x8953). In support of the financing, **SHELTON** and Gardner submitted a false credit application containing D.G.'s name, date of birth, and social security number. That application falsely represented that D.G. was a CPA at "Vintage Tax Firm" and earned $9,880 monthly. The paperwork also included proof of a Geico car insurance policy that **SHELTON** and Gardner took out in D.G.'s name and an Alabama Department of Revenue— Motor Vehicle Division power-of-attorney form signed under D.G.'s name to transfer title of the Audi to "D.G." Mitsubishi made a copy of the identification used to buy the car, which was the same fraudulent New Jersey license with D.G.'s name on it that agents seized from Gardner's apartment.

The paperwork supporting the purchase of the BMW was substantially similar. On May 3, 2022, **SHELTON** and Gardner again misrepresented that Gardner was D.G. to buy the BMW for the total amount of $30,707.21 with no cash down. **SHELTON** and Gardner financed the purchase of the BMW through Capital One (automobile loan number x47441001). Again, **SHELTON** and Gardner submitted a fraudulent credit application containing D.G.'s means of identification and falsely representing that D.G. was a CPA at "Vintage Tax Firm" earning $9,880 monthly. And

again, **SHELTON** and Gardner used the fraudulent New Jersey license with D.G.'s name on it that agents recovered from Gardner's apartment.

The victim, D.G., filed an identity-theft police report with the Philadelphia Police Department on May 22, 2022, after he received a Geico insurance policy in his name and BoA and Capital One contacted him for missed payments on the vehicles. D.G. ran a credit check and discovered several credit inquiries and two separate automobile loan accounts at BoA and Capital One, which D.G. confirmed to law-enforcement agents he did not make or authorize.

**SHELTON's** role and involvement in the fraudulent vehicle purchases is documented in several items of evidence, including (1) phone-location data placing **SHELTON** in the vicinity of Mitsubishi at the time of the sales; (2) tow receipts, bond paperwork, and police reports/traffic citations in which **SHELTON** was arrested driving the BMW in May 2022; (3) returns from **SHELTON's** Gmail account in which **SHELTON** received emails from BoA and Capital One in D.G.'s name related to the monthly payments for the cars; (4) Instagram messages that **SHELTON** exchanged with Gardner and others regarding the fraudulently purchased vehicles, including pictures of the cars, offers to sell them, and solicitation for switching their VINs; and (5) text messages between **SHELTON** and Gardner sharing D.G.'s means of identification, discussing its use for fraudulent purposes, and talking about avoiding detection of the fraudulent vehicle purchases.

As noted above, phone-location data obtained from Verizon pursuant to a federal search warrant placed **SHELTON** in the vicinity of Mitsubishi several times on the dates of the fraudulent vehicle purchases.

An inventory search of the BMW revealed a receipt indicating that the vehicle had been impounded under D.G.'s name on May 17, 2022, in Butler County, Alabama. The phone number

11

listed underneath D.G.'s name was one of Gardner's phone numbers. On May 17, 2022, a Butler County Sheriff's Deputy arrested **SHELTON** following a traffic stop for speeding on Interstate 65, during which **SHELTON** was the driver and sole occupant of the BMW. The deputy arrested **SHELTON** for having a pistol in the BMW without a permit and issued him a citation for speeding. **SHELTON** pleaded guilty to the pistol-permit offense on November 29, 2022, in *Alabama* v. *Shelton*, No. DC-2022-000408 (Dist. Ct., Butler Cty., Ala.). Additionally, during agents' search of the Audi, agents located a bond receipt indicating that Gardner bonded **SHELTON** out of jail in May 2022 following his arrest in Butler County.

Pursuant to a federal search warrant, agents obtained the content of **SHELTON's** Gmail account, which contained several items of evidence linking him to the fraudulent vehicle purchases. In connection with the fraudulent vehicle purchases in May 2022, **SHELTON** used his email account as a purportedly valid email through which BoA and Capital One could contact "D.G." For example, Capital One's account information sheet contains D.G.'s means of identification but lists **SHELTON's** email address and **SHELTON's** aunt's address on Oak Pointe Court in Mobile as a contact address.

In the Gmail account, **SHELTON** sent numerous email messages identifying himself, including emails he sent to make reservations for hotels and rental cars using his name. The Gmail account also contains emails linking it to **SHELTON's** fraudulent purchases of the BMW and the Audi. For example, on May 13, 2022, Capital One emailed **SHELTON's** Gmail account regarding "D.G.'s" Capital One username and a purported request to recover that username. Later, on June 17, 2022, **SHELTON's** Gmail account received an email from Capital One regarding late payments for the auto loan on the fraudulently purchased BMW using D.G.'s stolen identity.

12

Additionally, **SHELTON's** Gmail account is listed as the email address on file for his Instagram account, the content of which agents also obtained pursuant to federal search warrants.

In Instagram messages that **SHELTON** exchanged with Gardner on May 2, 2022, **SHELTON** and Gardner discussed obtaining the fake "D.G." identification from a third party. On May 4, 2022—the day after the fraudulent purchases—**SHELTON** messaged a third party on Instagram, asking whether that third party knew anyone who wanted to buy the BMW and the Audi to "scrap it" or to "switch da vins." The third party asked **SHELTON** to send pictures of the cars, and **SHELTON** replied by sending numerous pictures of each vehicle parked outside of Gardner's apartment and at Mitsubishi. In the messages he exchanged with the same third party, **SHELTON** described the vehicles as "not hot hot stolen," noting that they had "notes on em" and that any purchaser could "just run off for the paper." In later messages, **SHELTON** admitted that the vehicles were his, that he was "just tryna get em gone" for "cash," and that he was in Alabama and could "pull up" if he could "move em."

In messages that **SHELTON** exchanged with Gardner on May 24, 2022, **SHELTON** and Gardner discussed seeing additional cars that they admired at the Mitsubishi location where they had purchased the BMW and the Audi.

Agents obtained the contents of one of Gardner's cell phones pursuant to a federal search warrant. The phone contained numerous text messages that **SHELTON** and Gardner exchanged regarding the fraudulent purchases of the BMW and the Audi. For example, on April 28, 2022, Gardner sent **SHELTON** a text message containing D.G.'s name, social security number, and date of birth. Later, on May 1, 2022—the day before the fraudulent automobile purchases— **SHELTON** sent Gardner text messages discussing purchase a fake identification with D.G.'s information on it from a third party.

13

On May 13, 2022, **SHELTON** texted Gardner to note that they did not have "too much longer" in the fraudulently purchased BMW and Audi because the insurance on the cars had been refunded, which **SHELTON** noted was a "bad sign." **SHELTON** and Gardner discussed the fact that they had used D.G.'s address to fraudulently purchase automobile insurance for the vehicles. As charged in Count Fourteen of the Indictment, **SHELTON** admits that he transferred, possessed, and used D.G.'s means of identification—*i.e.*, D.G.'s name, date of birth, social security number, and address—without lawful authority and during and in relation to the bank-fraud conspiracy charged in Count Eleven of the Indictment, to which he is pleading guilty.

## Sentencing agreements

The parties agree for sentencing purposes that **SHELTON** should be held responsible for intended loss of more than $250,000 but less than $550,000. U.S.S.G. § 2B1.1(b)(1)(H). The parties further agree for sentencing purposes that **SHELTON's** offense involved (a) more than 10 victims; (b) conduct constituting sophisticated means; and (c) the possession and use of device-making equipment and authentication features. U.S.S.G. §§ 2B1.1(b)(2)(A)(i), (b)(10), and (b)(11).

AGREED TO AND SIGNED.

Respectfully submitted,

SEAN P. COSTELLO
UNITED STATES ATTORNEY

Date: March 6, 2023

Justin D. Roller
Assistant United States Attorney

14

Date: 3-7-2023
_____

Kasee S. Heisterhagen
Assistant United States Attorney
Deputy Chief, Criminal Division


Date: 3/24/23
_____

Jairice Lynn Shelton
Defendant


Date: 3/24/23
_____

H. Chase Dearman
Attorney for Defendant

15